**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Rooftop Group International Pte. Ltd. | § | Case No. 19-31443-hdh11 |
| | § | |
| Debtor. | § | |

**DECLARATION OF DARREN S. MATLOFF**

Pursuant to 28 U.S.C. § 1746, Darren S. Matloff declares as follows:

1. My name is Darren Scott Matloff. I am over twenty-one years of age, am of sound mind, and am competent in all respects to testify to the facts stated in this declaration. I have personal knowledge of all the facts stated in this declaration.

2. I am a director of Rooftop Group International Pte. Ltd. (the "***Debtor***" or "***Rooftop Singapore***"), which was formed on January 15, 2014, as a private limited liability company organized under the laws of Singapore. I make this declaration in opposition to the *Motion to Dismiss Bankruptcy Filing or, Alternatively, to Lift the Automatic Stay* [Docket No. 27] filed by Triumphant Gold Limited ("***TGL***") in the above-captioned chapter 11 case.

**A.     Rooftop USA**

3. For over a decade I have been in the business of manufacturing and selling toy and hobby-grade drones under the trade name Propel RC®. The business was originally organized and operated through Rooftop Group USA, Inc. ("***Rooftop USA***"), which was formed as a California corporation in 2008 and operated for several years out of Houston and Austin, Texas. The business grew steadily year over year and was profitable.  Today, the Propel RC brand is highly recognized throughout North America.

4. By 2014, however, the business had grown such that it had an increasing need both for access to greater capital investment for expansion and a more sophisticated finance team to manage its growing operations and generate audited financials  In 2014, I met Thian Chew, a former Goldman

Page 1

Sachs executive director, who subsequently joined Rooftop USA as its chief financial officer. Mr. Chew had also recently founded a private equity firm, Polar Ventures Overseas Limited ("*Polar*"), which he suggested could be a potential source of financing for Rooftop USA's growing needs.

B.     **The Rooftop business moves from Rooftop USA to the Debtor.**

5.     In 2014 and 2015, and with the assistance of its legal counsel, DLA Piper, Rooftop USA's business was restructured to take advantage of certain perceived tax attributes under Singapore law and to make it more attractive to foreign investors. With suppliers located across China and Southeast Asia, I believed it was a logical step in the company's evolution. To that end, the Debtor Rooftop Group International Pte. Ltd. was organized on January 15, 2014, as the new parent company of a series of subsidiary companies for anticipated business activity in North America, Europe, and Asia. The following chart illustrates the corporate structure following this corporate restructuring.



6.     On January 1, 2015, Rooftop USA conveyed all of its tangible and intangible assets to the Debtor via transfers from Rooftop USA to Asian Express Holdings Ltd. ("*Asian Express*") and then to the Debtor's parent company, Gandiva Investments Limited ("*Gandiva*"), a limited liability

company incorporated in the British Virgin Islands. Gandiva then assigned the assets and business operations to the Debtor, which at the time was its wholly-owned subsidiary. It is my understanding that this series of transfer was necessary or beneficial to the creation of the favorable tax structure that the Debtor's formation was meant to establish.

7. Also in January 2015, I contributed 100% of my own ownership of the business to an irrevocable family trust (the "*Trust*"), which was formed to hold this and other unrelated investments for the benefit of various members of my family. I am not the trustee of the Trust, but I do serve as its investment director. Since the formation of the Trust, however, I have not received any distribution of any kind from the Trust.

8. Today, ownership of the Debtor is currently held by three entities: (i) Gandiva, which holds 69% of the stock; (ii) Asset Resolution Company SPC, which holds 30% of the stock;[1] and (iii) Triumphant Gold Limited ("*TGL*"), which holds 1% of the stock. Gandiva itself continues to be held as an asset of the Trust. With Mr. Chew's assistance, the Debtor completed audited financials for 2015 and 2016.

**C.     The Disney License**

9. In 2016, the Debtor was presented with a significant growth opportunity when it was awarded a license by Disney to manufacture a line of Star Wars®-themed drones for distribution in the upcoming 2016 holiday season. To finance the ramp-up in production for the anticipated demand of the new product, as well as growing demand for the Propel RC products, the Debtor obtained a series of loans from Polar totaling $15.9 million in the spring and summer of 2016. That summer, TGL also made an initial round of loans to Rooftop USA totaling $10.0 million.[2] That same year, the Debtor also obtained $20.0 million in unsecured loans from UOC SPV1 Pte. Ltd.

---

[1] Upon information and belief, this entity holds the shares as nominee for another of the Debtor's prepetition lenders, UOC SPV1 Ptd. Ltd.

[2] Attached as <u>Schedule A</u> to this declaration is a detailed schedule of loans made to the Debtor and amounts repaid.

("*UOC*") and another $6.0 million in unsecured loans from Begaline Ltd. ("*Begaline*").

10. Upon information and belief, the loans of TGL and Polar were secured by pledges of the Debtor's purchase orders and accounts receivable, as well as by a pledge of a portion of Gandiva's stock in the Debtor and other assets, but were *not* secured by any lien on the Debtor's intellectual property assets. Upon information and belief, the Debtor's intellectual property assets are not encumbered by any lien or security interest.

**D.     Financial Distress**

11. From the start, there was significant demand for the Star Wars drones, and the Debtor engaged suppliers to manufacture a correspondingly large volume of inventory.[3] In late 2016, however, disaster struck when the launch of the Star Wars drones was postponed until September 2017. Nevertheless, at the time this seemed like a temporary setback that had nothing to do with the quality of Rooftop's business model, brand, or products. To the contrary, in return for the delayed launch, Disney expressed its continued support for the product, which was recognized in the fall of 2016 with Disney's License Technology Award.  Further, Disney expressed willingness to expand the Debtor's distribution rights to additional global markets.  Through this time, the Debtor's retailers (including Walmart and Costco) remained largely committed to the product.

12. Still, the resulting deferral in the fulfillment of 2016 purchase orders and subsequent sales put the Debtor into a significant liquidity crunch. The initial loans made by Polar and TGL were short term in nature, with maturity dates ranging from December 2016 to March 2018. With all of its money tied up in inventory, the Debtor faced the prospect of defaulting under its loan obligations.

13. In or about January 2017, the Debtor alerted TGL and Polar to the problems arising from the Disney launch and asked for a meeting of all its lenders. At the time, the delayed launch had triggered technical breaches

---

[3] Upon information and belief, title to this inventory has at all times been held by Rooftop USA, not the Debtor.

of financial covenants, but I do not believe that Rooftop had defaulted on any payment obligations at that time. Moreover, with a combined purchase order and commitment pipeline for Star Wars and Propel RC-branded products approaching $100 million, I believed that the Debtor would be able to repay its creditors by the end of 2017.

14. The Debtor's financial position continued to deteriorate through the spring of 2017. Without sufficient liquidity to meet operating expenses, the Debtor was unable to pay its Chinese suppliers, some of whom even made threats of physical violence (and resorted at times to actual violence) against Rooftop employees. At the same time, certain of the lenders threatened to declare more substantive defaults and commence legal proceedings, which in turn could have triggered breaches of the Debtor's license agreement with Disney.

15. Faced with such a cascade of troubles, I engaged in discussions with representatives of TGL and Polar to extend their existing maturity dates and provide additional financing to support operations through the Disney launch. From June to August 2017, Polar advanced another $9,750,000 to Rooftop, and TGL advanced another $11,250,000. At the same time, Polar and TGL both extended their maturity dates and substantially increased the interest rates on the outstanding loan obligations from 15% to 48%. *See* Schedule A.

16. Finally, in September 2017, the Debtor's Star Wars drones hit the shelves. Whether as a result of the delayed launch or for other reasons, however, sales were substantially lower than anticipated. With retailers canceling secondary and tertiary purchase orders and threatening to return goods if the Debtor did not lower its costs through cash rebates to the retailers to offset their own price discounting, Rooftop realized a significant decline in net cash receipts over what was originally projected based on purchase orders received.

17. Despite its financial difficulties, however, by February 2018 the Debtor had repaid *more than $29.3 million to Polar* on loans with an original principal balance of $26.75 million. *See* Schedule A. Over the same

period, the Debtor repaid *more than $22.3 million to TGL* on loans with an original principal balance of $21.25 million. *Id.*

18. Still, despite these setbacks, the Debtor and Rooftop USA continued to receive and fill purchase orders for Propel RC drones and, to a much lesser degree, Star Wars drones. Rooftop USA's inventory purchases were factored through a purchase order financing arrangement provided by Star Funding, Inc. ("***Star Funding***"). Under this arrangement, Star Funding would pay suppliers directly for manufactured product, take ownership of the inventory, and collect the proceeds from fulfilled purchase orders. After retaining its costs and commission, Star Funding would remit the balance to Rooftop USA, which used those funds to repay suppliers, employees, and other trade vendors.

19. However, as the Star Wars inventory continued to underperform, gross receipts from sales declined. Suppliers began to require Star Funding to repay portions of old debts to induce them to fulfill new purchase orders. At the same time, in 2018 retailers imposed payment deductions on the Star Funding receivables to account for 2017 returns and rebates used to offset their own price reductions and boost the lagging sales associated with the fall-out from the failed Star Wars launch. To this end, Star Funding began to withhold additional funds against future refunds and offsets. As a result, Rooftop USA's liquidity—and the Debtor's—dried up almost completely.

20. The final straw came in late 2018 when a discrepancy arose on a $1.6 million letter of credit made out to the Debtor's largest supplier issued by Star Funding to secure product shipments. Based on assurances given by Star Funding, the Debtor made assurances to one or more suppliers that the letter of credit would be honored, and those suppliers subsequently shipped Rooftop product based on that assurance. When Star Funding imposed a stop payment on the letter of credit, however, the suppliers' remaining faith in Rooftop evaporated.

21. High volume retailers like Walmart and Costco are highly sensitive to any indication that a supplier might not be able to deliver a sufficiently reliable stream of product to fill the designated shelf space in the

retailer's stores. Stripped of cash by TGL and Polar, and with no other apparent source of liquidity to finance continued manufacturing and the suppliers' loss of confidence in the Debtor, the Debtor and other Rooftop entities had no ability to issue new orders to manufacture inventory for the 2019 season. The damage to the Debtor's business was catastrophic.

22. In final effort to prevent an interruption in the availability of Propel RC drones to fulfill continuing purchase orders and to keep its brand alive, on February 14, 2019, the Debtor entered into a nonexclusive license agreement (the "*Amax License*") with Amax Industrial Group China Co, Ltd. ("*Amax*") to use certain of the Debtor's trademarks to manufacture Propel RC-branded drones. The Amax License is governed by the laws of the State of California, and provides that any action to enforce the terms of the Amax License will be brought in a California court. The Amax License authorizes Amax to use these marks in connection with the manufacture, advertisement, promotion, and sale of drones in the United States, Canada, and Mexico in exchange for a royalty equal to 3.5% of the invoice price of all Propel RC product manufactured and shipped by Amax. The Debtor estimates this will generate $0.8 to $1.2 million in revenue annually at historical sales levels.

23. Despite these efforts, and despite the continued strength of the Propel RC brand, TGL commenced various legal actions against me, the Debtor, and certain of the Debtor's affiliates to enforce its rights under the various loan agreements, including to enforce its rights to a pledge of a portion of Gandiva's shares of stock in the Debtor. By this action, I believe that TGL seeks to gain control of the Debtor and its assets to the exclusion of the Debtor's other creditors, despite not holding a perfected security interest in the Debtor's intellectual property.

24. Aside from its minimal business activity pertaining to the Amax License, however, the Debtor currently has no other operations and has no employees. Its remaining assets are composed almost entirely of certain patents, trademarks, and other intellectual property. Rooftop USA still holds a small amount of inventory in warehouses located in Dallas, TX; Seattle, WA; and Vancouver. Rooftop USA is liquidating some of this inventory and using other product to fulfill "replenishment" purchase orders

for Walmart and other retailers until Amax's production can to step into the breach and ensure a continuous supply of Propel RC products to satisfy ongoing demand.[4] With purchase orders still being issued for the 2019 holiday season, the remaining business enterprise is at a delicate juncture.

**E.      The Chapter 11 Filing**

25.     To preserve the remaining business for the benefit of creditors and other stakeholders, therefore, on April 30, 2019 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11.

26.     Despite its formation as a Singapore entity, the Debtor has numerous ties to the United States:

(a)     The Debtor is the successor to a retail manufacturing and sales enterprise that was organized and operated for several years in the United States through Rooftop USA before the business began to transition to the Debtor and its associated corporate structure in 2015.

(b)     The Debtor's principal assets include trademarks and patents registered in the United States.

(c)     The Debtor's sole licensing agreement and sole source of projected revenue is governed under California law.

(d)     The founder, director, and sole remaining officer of the Debtor resides in the United States.

(e)     TGL's director, Danny Yee, is a US citizen with property in the United States.

27.     The decision to file for protection in the United States rather than Singapore was based on a careful evaluation of the Debtor's alternatives in close consultation with legal counsel both in the United States and in Singapore. Under chapter 11, I understand the Debtor would receive the benefit of the "breathing spell" afforded under 11 U.S.C. § 362, which would enable the Debtor to take stock of its current situation, properly evaluate its alternatives, and execute upon a viable strategy without interference from

---

[4] The proceeds from the sale of this inventory is presently being used by Rooftop USA to pay its own employees, suppliers, and other vendors.

TGL or other creditors. Based on discussions with several interested parties, I am confident that the Debtor's remaining intellectual property assets--including the Propel RC brand and the Amax License—are valuable assets. These assets can be monetized for the benefit of the Debtor's creditors and, in the hands of a capable operator, used to sustain and preserve what has been an otherwise successful global business enterprise for nearly fifteen years. In addition, as I am the sole remaining officer of the Debtor and reside in the United States, it is exceedingly difficult for me to participate fully and actively in proceedings in Singapore.

28. Against that prospect, I fear that TGL's goals in seeking dismissal of this case or relief from the automatic stay are more selfish in nature. As evidenced from the Debtor's *Schedules of Assets and Liabilities*, the Debtor is patently insolvent; it's stock is worthless as a financial asset. Upon information and belief, therefore, TGL seeks to enforce its charge against Gandiva's stock not to claim valuable collateral from which to repay outstanding loans, but to seize control of the Debtor and its assets. Whether TGL's goal is to seize the Debtor's valuable intellectual property for itself or to simply obliterate the Debtor's business entirely, I do not believe that TGL intends—if successful in Singapore—to preserve the Debtor's assets and remaining business operations for the benefit of other creditors, Amax, and other stakeholders. TGL's preference for more aggressive, self-interested tactics—whether legally justifiable or not—suggest otherwise.

29. Most recently, on June 18, 2019, Singapore counsel filed an application in the High Court of the Republic of Singapore for recognition of this chapter 11 case as a foreign main proceeding under Singapore law. A hearing on that application is currently scheduled for August 15, 2019.

30. Accordingly, I believe the interests of the Debtor, its estate, and its creditors will best be served by the denial of TGL's motion so that the Debtor may pursue its current efforts to maximize the value of its assets and related business operation for the benefit of all stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on July 1, 2019

_____
Darren S. Matloff

# SCHEDULE A

## Polar Ventures Overseas Limited

| Date | Loan Principal | Payment Principal | Interest |
|---|---|---|---|
| 3/30/2016 | 750,000 | - | - |
| 3/30/2016 | 750,000 | - | - |
| 5/9/2016 | 1,800,000 | - | - |
| 5/13/2016 | 3,200,000 | - | - |
| 6/24/2016 | 2,500,000 | - | - |
| 6/29/2016 | 500,000 | - | - |
| 6/30/2016 | - | - | (165,830) |
| 6/30/2016 | - | - | (57,021) |
| 7/12/2016 | 1,000,000 | - | - |
| 7/26/2016 | 1,000,000 | - | - |
| 7/28/2016 | 1,000,000 | - | - |
| 8/26/2016 | 1,400,000 | - | - |
| 9/5/2016 | 2,000,000 | - | - |
| 9/30/2016 | - | - | (42,082) |
| 9/30/2016 | - | - | (302,466) |
| 9/30/2016 | - | - | (56,712) |
| 10/21/2016 | 1,100,000 | - | - |
| 10/27/2016 | - | - | (323,342) |
| 11/11/2016 | - | - | (80,877) |
| 12/29/2016 | - | (2,750,000) | - |
| 12/30/2016 | - | - | - |
| 12/31/2016 | - | - | (214,521) |
| 12/31/2016 | - | - | (161,096) |
| 12/31/2016 | - | - | (299,178) |
| 12/31/2016 | - | - | (56,712) |
| 3/7/2017 | - | - | (30,000) |
| 3/31/2017 | - | - | - |
| 3/31/2017 | - | - | (310,685) |
| 3/31/2017 | - | - | (166,438) |
| 3/31/2017 | - | - | (172,856) |
| 3/31/2017 | - | - | (55,479) |
| 4/30/2017 | - | - | (101,250) |
| 5/12/2017 | - | - | (26,129) |
| 5/12/2017 | - | - | - |

*Signature Page to Declaration of Darren S. Matloff*

| Date | Loan Principal | Payment Principal | Interest |
|---|---|---|---|
| 6/9/2017 | - | - | (39,750) |
| 6/27/2017 | - | - | - |
| 6/27/2017 | - | - | - |
| 6/27/2017 | - | - | - |
| 6/27/2017 | - | - | - |
| 6/28/2017 | - | - | (307,233) |
| 6/30/2017 | - | - | (168,288) |
| 6/30/2017 | - | - | (106,875) |
| 6/30/2017 | - | - | (56,096) |
| 6/30/2017 | 2,000,000 | - | - |
| 7/21/2017 | 3,000,000 | - | - |
| 7/31/2017 | - | - | (396,575) |
| 7/31/2017 | - | - | (173,959) |
| 8/1/2017 | - | - | (199,356) |
| 8/8/2017 | 1,250,000 | - | - |
| 8/16/2017 | 2,500,000 | - | - |
| 8/18/2017 | 1,000,000 | - | - |
| 8/31/2017 | - | - | (483,082) |
| 8/31/2017 | - | - | (307,479) |
| 9/25/2017 | - | (2,250,000) | - |
| 9/28/2017 | - | (1,500,000) | - |
| 9/28/2017 | - | (2,250,000) | - |
| 9/30/2017 | - | - | (545,548) |
| 9/30/2017 | - | - | (230,918) |
| 10/23/2017 | - | - | (79,110) |
| 10/23/2017 | - | - | (47,466) |
| 10/23/2017 | - | (1,250,000) | - |
| 10/31/2017 | - | - | (426,781) |
| 10/31/2017 | - | - | (222,658) |
| 11/9/2017 | - | - | (33,288) |
| 11/9/2017 | - | - | 28,110 |
| 11/9/2017 | - | (4,500,000) | - |
| 11/9/2017 | - | (283,696) | - |
| 11/10/2017 | - | (55,456) | - |
| 11/15/2017 | - | (483,854) | - |
| 11/21/2017 | - | (863,948) | - |
| 11/24/2017 | - | (1,053,563) | - |
| 11/30/2017 | - | - | (445,911) |
| 11/30/2017 | - | - | 49,924 |

*Signature Page to Declaration of Darren S. Matloff*

| Date | Loan Principal | Payment Principal | Interest |
|---|---|---|---|
| 11/30/2017 | - | - | (18,613) |
| 12/6/2017 | - | (700,624) | - |
| 12/18/2017 | - | (1,661,332) | - |
| 12/21/2017 | - | (821,237) | - |
| 12/21/2017 | - | (276,154) | - |
| 12/31/2017 | - | - | (186,211) |
| 1/8/2018 | - | (15,914) | - |
| 1/12/2018 | - | (85,888) | - |
| 1/16/2018 | - | (81,143) | - |
| 1/16/2018 | - | - | - |
| 1/24/2018 | - | (41,278) | - |
| 1/26/2018 | - | - | (13,305) |
| 1/26/2018 | - | (275,281) | - |
| 2/1/2018 | - | (768,390) | - |
| 3/1/2018 | - | - | (339,665) |
| | **26,750,000** | **(21,967,758)** | **(7,372,807)** |

## Triumphant Gold Limited

| Date | Loan Principal | Payment Principal | Payment Interest |
|---|---|---|---|
| 7/28/2016 | 7,000,000 | - | - |
| 9/1/2016 | 3,000,000 | - | - |
| 9/30/2016 | - | - | (249,863.01) |
| 12/31/2016 | - | - | (446,136.98) |
| 3/31/2017 | - | - | (418,684.93) |
| 6/28/2017 | - | - | (365,753.43) |
| 6/28/2017 | - | - | - |
| 7/6/2017 | 3,000,000 | - | - |
| 7/20/2017 | 7,000,000 | - | - |
| 7/31/2017 | - | - | (412,602.74) |
| 7/31/2017 | - | - | (191,671.23) |
| 8/1/2017 | - | - | (254,794.52) |
| 8/8/2017 | 1,250,000 | - | - |
| 8/31/2017 | - | - | (534,246.58) |
| 8/31/2017 | - | - | (240,000.00) |
| 9/25/2017 | - | (550,000) | - |
| 9/25/2017 | - | (220,000) | - |
| 9/25/2017 | - | (300,000) | - |
| 9/25/2017 | - | (490,000) | - |
| 9/25/2017 | - | (495,000) | - |
| 9/25/2017 | - | (495,000) | - |
| 9/26/2017 | - | (200,000) | - |
| 9/26/2017 | - | (400,000) | - |
| 9/27/2017 | - | (200,000) | - |
| 9/27/2017 | - | (400,000) | - |
| 9/28/2017 | - | (2,789,000) | - |
| 9/28/2017 | - | (613,000) | - |
| 9/28/2017 | - | (398,000) | - |
| 9/28/2017 | - | (2,220,000) | - |
| 9/28/2017 | - | (125,000) | - |
| 9/28/2017 | - | (105,000) | - |
| 9/30/2017 | - | - | (499,767.12) |
| 9/30/2017 | - | - | (149,769.86) |
| 10/23/2017 | - | - | (23,630.14) |
| 10/23/2017 | - | - | (47,465.75) |
| 10/23/2017 | - | (1,250,000) | - |
| 10/31/2017 | - | - | (254,794.52) |

*Signature Page to Declaration of Darren S. Matloff*

| Date | | | |
|---|---|---|---|
| 10/31/2017 | - | - | (147,945.21) |
| 11/9/2017 | - | (231,589) | - |
| 11/10/2017 | - | (45,270) | - |
| 11/15/2017 | - | (394,983) | - |
| 11/21/2017 | - | (705,263) | - |
| 11/24/2017 | - | (860,052) | - |
| 11/30/2017 | - | - | (364,009.38) |
| 11/30/2017 | - | - | 40,754.18 |
| 11/30/2017 | - | - | (12,954.43) |
| 12/6/2017 | - | (571,938) | - |
| 12/18/2017 | - | (1,356,189) | - |
| 12/21/2017 | - | (670,397) | - |
| 12/21/2017 | - | (225,432) | - |
| 12/31/2017 | - | - | (152,008.98) |
| 1/8/2018 | - | (12,991) | - |
| 1/12/2018 | - | (70,112) | - |
| 1/16/2018 | - | - | - |
| 1/17/2018 | - | (66,214) | - |
| 1/24/2018 | - | (33,697) | - |
| 1/26/2018 | - | - | (10,861.42) |
| 1/26/2018 | - | (224,719) | - |
| 2/1/2018 | - | (627,257) | - |
| 3/1/2018 | - | - | (277,277.30) |
| | **21,250,000** | **(17,346,104)** | **(5,013,483)** |

*Signature Page to Declaration of Darren S. Matloff*

## UOC SPV1 Pte. Ltd.

| Date | Loan Principal | Payment Principal | Interest |
|---|---|---|---|
| 11/1/2016 | 15,000,000 | - | |
| 11/25/2016 | 5,000,000 | - | - |
| 12/31/2016 | - | - | (41,111) |
| 12/31/2016 | - | - | (203,333) |
| 3/31/2017 | - | - | (100,000) |
| 3/31/2017 | - | - | (300,000) |
| 6/30/2017 | - | - | (126,389) |
| 6/30/2017 | - | - | (379,167) |
| 8/11/2017 | - | - | - |
| 10/27/2017 | - | - | (1,177,778) |
| | **20,000,000** | **-** | **(2,327,778)** |

## Begaline Ltd.

| Date | Loan Principal | Payment Principal | Interest |
|---|---|---|---|
| 12/21/2016 | 5,000,000 | - | - |
| 1/20/2017 | 1,000,000 | - | - |
| 7/21/2017 | - | - | - |
| 12/15/2017 | - | - | - |
| 2/6/2018 | - | - | - |
| | **6,000,000** | **-** | **-** |

*Signature Page to Declaration of Darren S. Matloff*